IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TRACEY L. THOMAS, )
 )
      Plaintiff, )   Civil Action No. 13-267 Erie
 )
  v. )
 )
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security, )
 )
      Defendant. )

## MEMORANDUM OPINION

**NORA BARRY FISCHER, District Judge.**

## I. INTRODUCTION

Tracey L. Thomas ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401, *et seq*. and § 1381 *et seq*. This matter comes before the Court on cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. (ECF. Nos. 9 and 11). The record has been developed at the administrative level. (ECF No. 7).[1] For the following reasons, Plaintiff's Motion for Summary Judgment (ECF No. 9) is granted in part and denied in part, and Defendant's Motion for Summary Judgment (ECF No. 11) is denied.

## II. PROCEDURAL HISTORY

Plaintiff filed her applications on February 22, 2011, claiming disability since May 18, 2002 due to a learning disability, anxiety, and depression. (R. at 140-150, 161). Her applications were denied (R. at 56-73), and she requested a hearing before an administrative law judge ("ALJ"). (R. at 86-87). A hearing was held on May 30, 2012, wherein Plaintiff appeared and testified, and Francis Kimbley, an impartial vocational expert, also appeared and testified.

---

[1] References to the administrative record (ECF No. 7), will be designated by the citation "(R. at ___)".

1

(R. at 27-54). On June 29, 2013 the ALJ issued a written decision denying benefits. (R. at 11-23). Plaintiff's request for review by the Appeals Council was denied (R. at 1-6), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). She filed her complaint challenging the ALJ's decision on September 4, 2013 (ECF No. 3), and the parties subsequently filed cross-motions for summary judgment. (ECF Nos. 9 and 11). Accordingly, the matter has been fully briefed and is ripe for disposition.

## III. BACKGROUND

### A. General Background

Plaintiff was thirty-six years old on the date of the ALJ's decision. (R. at 21, 23). She completed school through the ninth grade, and dropped out in the tenth grade after becoming pregnant. (R. at 36, 162). Plaintiff worked for three years as a food preparer. (R. at 162). Her school records revealed that she repeated the first grade and was in learning support classes. (R. at 193-197). During the second grade, Plaintiff was administered the Wechsler Intelligence Scale for Children ("WISC") in January 1985. (R. at 193). She achieved a verbal intelligence quotient ("IQ") score of 82, which was low average, a performance IQ score of 75, which was borderline, and a full scale IQ score of 78, which was borderline. (R. at 193). Plaintiff was again administered the WISC in 1987 while in the fourth grade. (R. at 195). This testing revealed that Plaintiff had a verbal IQ score of 69, a performance IQ score of 71, and a full scale IQ score of 69, indicating her functional level was "educable." (R. at 195). It was noted that her progress level was one to two years below her grade placement level, and it was recommended that planning for individualized placement occur at that point in time. (R. at 195).

### B. Medical Background

Plaintiff was seen at Community Health Net for complaints of diverticulitis and anxiety on March 3, 2010, and Xanax was prescribed. (R. at 224-226). On March 16, 2010, Plaintiff complained of panic attacks after her mother was diagnosed with cancer, and Celexa was prescribed. (R. at 224). On March 17, 2010, Plaintiff called her provider and stated that she did not want to take Celexa after reading about the possible side effects. (R. at 224).

2

Plaintiff began seeing Gary Silko, M.D., at Saint Vincent Family Medicine Center for depression, anxiety, and eczema on May 4, 2010. (R. at 208-209). At her initial visit, Plaintiff complained of a recent episode of diverticulitis and an upper respiratory infection. (R. at 208). Her physical was unremarkable, and she was diagnosed with anxiety and colonic diverticulosis. (R. at 209). She was prescribed an anti-anxiety medication and an anti-depressant, as well as a medication for her gastrointestinal symptoms. (R. at 209). The next month, on June 16, 2010, Plaintiff telephoned Dr. Silko's office and expressed a concern regarding the accuracy of the dosage amount of her Celexa prescription. (R. at 220).

When she returned to Dr. Silko on January 25, 2011, Plaintiff complained of increased anxiety symptoms, reporting that her sons were getting ready to drive and her mother had recently died following a long illness. (R. at 206). Plaintiff indicated that her anti-anxiety medication helped "a little." (R. at 206). Plaintiff further complained of a rash on both hands for which an over-the-counter ointment had been ineffective. (R. at 206). Plaintiff stated that her hands were in dishwater and she did the laundry. (R. at 206). On physical examination, Dr. Silko observed cracking and fissuring of all fingers and dorsum of her hands. (R. at 206). She was diagnosed with anxiety, colonic diverticulosis and eczema. (R. at 207). Her anti-anxiety medication dosage was increased, and she was instructed on the use of steroid ointment and moisturizers for her hands, as well as the use of protective gloves. (R. at 207).

On May 19, 2011, Plaintiff underwent a psychological evaluation performed by Byron Hillin, Ph.D. (R. at 227-243). Dr. Hillin reported that Plaintiff was fully cooperative, provided information spontaneously, and "gave appropriate effort for psychological testing." (R. at 227). Plaintiff claimed an inability to work secondary to learning disabilities, anxiety and depression. (R. at 227). She stated that she had applied for several jobs, but had never been called back. (R. at 227). Plaintiff stated that the only job she had was for two years on a part-time basis making salads at a restaurant. (R. at 229). Plaintiff stated that she stopped working in 2002 after the business closed. (R. at 229).

Plaintiff reported that she sought treatment for increased stress after her mother was diagnosed with cancer. (R. at 228). She took Celexa and Xanax prescribed by her family

3

physician, but denied any other form of psychiatric treatment. (R. at 227-228). Plaintiff described her mood as sad "sometimes" and described herself as an excessive worrier. (R. at 228). She stated she was in good medical health and had no restrictions. (R. at 228). Plaintiff reported that she had been diagnosed with learning disabilities in her early years and was in learning support classes throughout her educational history. (R. at 228). She indicated that she struggled with class work and had been held back in the fourth grade, but had no behavioral problems in school. (R. at 228). She dropped out of school in the tenth grade after becoming pregnant. (R. at 228).

Plaintiff reported that she lived with her boyfriend and five children, ages nineteen, seventeen, ten, nine, and five. (R. at 229). Her seventeen year old son received disability benefits for learning disabilities, and she was the payee. (R. at 229). Plaintiff was able to cook, clean, and shop, and denied any history of difficulties raising her children. (R. at 229). She had a driver's license, but seldom drove, stating that she received special help in getting her license secondary to her reading problems. (R. at 229). Plaintiff described her reading ability as "poor" and stated she was only able to read simple print. (R. at 228). She stated that her boyfriend helped her complete the disability forms and helped her pay bills. (R. at 228). Plaintiff indicated that she was shy and reserved, had few friends, and was mildly anxious in public. (R. at 229).

On mental status examination, Dr. Hillin reported that Plaintiff was alert, fully oriented, exhibited appropriate grooming and hygiene, and exhibited fair eye contact. (R. at 229). He observed her hands were red secondary to psoriasis, her gait was appropriate, and her motor behaviors were unremarkable. (R. at 229). Dr. Hillin indicated that Plaintiff's primary complaint was her long-term learning difficulties and her inability to help her children with their homework. (R. at 230). She also described increased anxiety since her mother's death, but felt her medications were helpful. (R. at 230). Plaintiff indicated that she felt self-conscious about her learning difficulties, feeling "stupid." (R. at 230). Dr. Hillin reported that her affect was mildly anxious, and her thoughts were relevant, coherent and goal directed. (R. at 230). Plaintiff was unable to read the Bureau of Disability letter, she was able to perform simple math

calculations, but could not perform multiplication, and her general fund of information was low. (R. at 230).

Dr. Hillin administered the Weschler Adult Intelligence Scale IV ("WAIS-IV"), and reported that Plaintiff obtained a verbal comprehension score of 66, a perceptual reasoning score of 75, a working memory score of 69, a processing speed score of 71, and a full scale IQ score of 65, which placed her in the mild mental retardation range. (R. at 230). Dr. Hillin also noted that Plaintiff should be considered "generally illiterate." (R. at 231). He diagnosed Plaintiff with adjustment disorder with anxiety and depression secondary to her mother's death, mild mental retardation, and personality disorder, not otherwise specified, and assessed her with a Global Assessment of Functioning ("GAF") score of 60.[2] (R. at 231). Dr. Hillin found that Plaintiff was competent to manage her finances. (R. at 232). He further found that she struggled with complex material, and was shy, reserved and somewhat socially avoidant, but was able to retain simple instructions and follow simple directions and hands-on simple repetitive tasks. (R. at 232).

In connection with his evaluation, Dr. Hillin opined that Plaintiff was moderately limited in her ability to understand, remember, and carry out short, simple instructions, interact appropriately with the public, and make judgments on simple work-related decisions. (R. at 240). He further opined that she was extremely limited in her ability to understand, remember, and carry out detailed instructions. (R. at 240). She was moderately limited in her ability to interact appropriately with the public, supervisors, and co-workers; and respond appropriately to pressures and changes in the work setting. (R. at 240).

---

[2]The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. Text Revision 2000). Scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

On May 27, 2011, Manella Link, Ph.D., a state agency reviewing psychologist, reviewed the psychiatric evidence of record and concluded that Plaintiff had no restriction in her activities of daily living, only mild difficulties in social functioning, and moderate difficulties with respect to maintaining concentration, persistence and pace. (R. at 59). He found that while Plaintiff had attained low IQ scores, her condition did not meet the capsule definition of mental retardation as set forth in the listing. (R. at 59). He observed that Plaintiff cared for her children, was able to drive, shop, manage funds, perform household chores, and go out alone independently. (R. at 59). He further observed that Plaintiff worked part-time for three years in "food prep." (R. at 59). Except for finding that she was markedly limited in her ability to understand, remember, and carry out detailed instructions, he found she was not significantly limited or only moderately limited in most other mental work-related areas. (R. at 60-61).

Plaintiff returned to Dr. Silko on March 3, 2012 and complained of increased sores on her face that became irritated when she scratched them, and that her hands had worsened in terms of dryness, cracking and discomfort. (R. at 250). Plaintiff further reported that Xanax was not controlling her anxiety, stating that she became tearful and easily upset. (R. at 250). On physical examination, Dr. Silko reported that Plaintiff had multiple excoriations on her face, and that her hands were red and cracking, with fissuring of all fingers to about the mid palm and mid dorsum. (R. at 250). He prescribed an ointment for her skin condition, increased her anti-depressant medication, and changed her anti-anxiety medication. (R. at 251).

When seen on April 20, 2012, Plaintiff reported that her hands were better but were still red and dry, which she attributed to perspiration. (R. at 252). She further reported that she had not "gotten much relief" from her change in medications and was having sleep difficulties. (R. at 252). Plaintiff stated she was under a "lot of stress" at home with her children and younger daughter's health issues. (R. at 252). Dr. Silko found Plaintiff's hands were red on all ten fingers with some fissuring and scaling. (R.at 252). He adjusted her medications. (R. at 253).

C. *Administrative Hearing*

Plaintiff and Francis Kimbley, an impartial vocational expert, testified at the hearing held by the ALJ on May 30, 2012. (R. at 27-54). Plaintiff testified that she lived in an apartment with

her boyfriend and four of their five children. (R. at 33). One of her sons received disability benefits for a learning disability. (R. at 33). Plaintiff testified that she had a driver's license, but that it took her a "long time" before she was able to pass the test. (R. at 33-35). She had not driven for several years, claiming that her medications made her tired and caused dizziness. (R. at 33-35). Plaintiff stated that prior to taking medication, she rarely drove because she was nervous and would panic. (R. at 35). Her boyfriend or sister drove her places, and she was unable to ride the bus, stating she would not know "what bus to take." (R. at 34-35). Plaintiff testified that she dropped out of school in the tenth grade and never received a GED. (R. at 36). Plaintiff indicated she received learning support in school, but had never repeated a grade. (R. at 36). Plaintiff stated that she was able to read simple words, but was unable to read a newspaper or simple note. (R. at 36). She was able to make simple change, but her boyfriend handled the finances. (R. at 37). Plaintiff testified that she was unable to work because she might "get tired" or "lose [her] balance." (R. at 38). Plaintiff stated that Dr. Silko, her primary care physician, prescribed her medications, and he had not referred her for mental health treatment. (R. at 38-39). Plaintiff claimed her medications had not helped her symptoms. (R. at 39).

Plaintiff testified that she became nervous and experienced anxiety attacks "at least a couple of times a day" lasting from five to thirty minutes. (R. at 40-41). Plaintiff stated that she cried regularly, was easily stressed out, did not like to be around people, and had trouble concentrating. (R. at 41-43). She testified that she rarely left home, but acknowledged attending school plays, school open houses, and parent-teacher conferences with her boyfriend. (R. at 43-44). Plaintiff stated she would be able to take her children to the doctor. (R. at 44). Plaintiff testified that she had no hobbies or outside interests. (R. at 46).

In addition of her mental impairments, Plaintiff testified that she "barely" performed any household chores because she was precluded from getting her hands wet because of her eczema. (R. at 44). Plaintiff indicated that her hands cracked and bled when wet, and the hand cream prescribed by Dr. Silko had not been helpful. (R. at 44). He had not, however, referred her to a dermatologist. (R. at 45).

7

The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was able to perform light work, but would not be able to perform any jobs that required exposure to excessive levels of wetness or humidity, meaning her hands would have to stay dry throughout the course of the workday. (R. at 51). The hypothetical individual would also be limited to jobs involving no more than simple, routine, repetitive tasks that were performed in a low-stress environment, defined as one involving no high volume productivity requirements and very infrequent unexpected changes, for example, a stable work atmosphere with no complex decisionmaking. (R. at 51-52). The hypothetical individual was also limited to jobs involving no more than occasional interaction with the public, coworkers and supervisors. (R. at 52). The vocational expert testified that such an individual could perform the jobs of a packing line worker, office helper, and mail clerk. (R. at 52).

## IV. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see also Richardson v. Parales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh evidence of record. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either

those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[3], 1383(c)(3)[4]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). The

---

[3] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[4] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190-91 (3d. Cir. 1986).

## V. DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition. 20 C.F.R. §§ 404.1520; 416.920. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

In his decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of May 18, 2002. (R. at 13). The ALJ further found that Plaintiff had the following severe impairments: eczema, anxiety, depression, and a learning

disability. (R. at 13). At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Pt. 404 Subpt. P, App. 1 of the regulations. (R. at 14-17). Despite her impairments, the ALJ found that she had the residual functional capacity ("RFC")[5] to perform light work, but would not be able to perform any jobs that required exposure to excessive levels of wetness or humidity, meaning her hands would have to stay dry throughout the course of the workday, and would be limited to jobs involving no more than simple, routine, repetitive tasks that were performed in a low-stress environment, defined as one involving no high volume productivity requirements and very infrequent unexpected changes, for example, a stable work atmosphere with no complex decisionmaking. (R. at 17). The ALJ further found that Plaintiff was limited to jobs involving no more than occasional interaction with the public, coworkers and supervisors. (R. at 17). At the final step, the ALJ concluded that Plaintiff could perform the jobs cited by the vocational expert at the administrative hearing. (R. at 22). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff's sole challenge relates to the ALJ's findings at step three of the sequential evaluation process. Step three requires a determination of whether the claimant has an impairment or combination of impairments which meets or equals a listed impairment in Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). A claimant who meets or medically equals all of the criteria of an impairment listed in Appendix 1 is *per se* disabled and no further analysis is necessary. *Burnett v. Commissioner*, 220 F.3d 112, 119 (3d Cir. 2000). A claimant bears the burden of proving that his impairments meet or equal a listed impairment. *See Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).

---

[5] "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). In making this determination, the ALJ must consider all the evidence before him. *Burnett*, 220 F.3d at 121.

Plaintiff argues that the ALJ erred in concluding that her impairments did not meet the listing requirements for § 12.05 Mental Retardation under section C. The listing for 12.05C contains the following language:

> 12.05 *Mental retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. …
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.] …

20 C.F.R. Pt. 404 Subpt. P, App. 1, § 12.05C;[6] *see also Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003); *Gist v. Barnhart*, 67 Fed. Appx. 78, 80-1 (3d Cir. 2003). In concluding that the above requirements were not met, the ALJ reasoned:

> [T]he "paragraph C' criteria of listing 12.05 are not met because although the claimant does have a valid verbal, performance, or full scale IQ of 60 through 70 and another impairment imposing additional and significant work-related limitation of function, the evidence fails to indicate that the capsule definition of Listing 12.05 had been met. This capsule definition requires that the claimant must first show that she has subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period in order to establish disability under Listing 12.05C.
>
> In so finding, the undersigned acknowledges that claimant's intellectual functioning is below average. However, the evidence of record is insufficient to establish that the claimant suffers from deficits in adaptive functioning that manifested during her developmental years. While the claimant was involved in learning support classes, failed to complete high school, or attend any supplemental training, the evidence also demonstrates that she left school after becoming pregnant, not because she was incapable of completing her coursework. Additionally, as mentioned above, the claimant has worked only one job, which ended when the restaurant she was working for closed. (See Ex. 3F). Furthermore, despite the claimant's testimony that she is essentially unable to

---

[6] Plaintiff advances no argument that her impairments met the A, B or D criteria; accordingly, we need not recite these criteria herein and confine our analysis to the application of the C criteria.

count, read, or help her children with their homework, the record reveals she is capable of managing the benefits paid to her son, and is capable of reading warnings regarding her prescriptions. (See Ex. 3F; 2F). Finally, the undersigned notes that despite her allegations of disability, the evidence of record indicates that following the report from her fourth grade psychological testing from 1987, the claimant did not seek treatment for any physical or mental condition until March 2010. Moreover, she never sought assistance through the Office of Vocational Rehabilitation or any other program for help with her allegedly disabling learning disabilities.

Based on the foregoing, the undersigned acknowledges that the claimant has some deficits in adaptive functioning; however, there is no indication that these deficits manifested themselves before she attained age 22. Accordingly, the undersigned finds that the claimant fails to satisfy the capsule definition to Listing 12.05C.

(R. at 17).

Plaintiff argues that the ALJ's findings are not supported by substantial evidence because he failed to apply any recognized criteria or methodology in assessing her "deficits in adaptive functioning." We considered this precise issue in *Logan v. Astrue*, 2008 WL 4279820 (W.D.Pa. 2008), wherein we observed that the Commissioner's regulations did not define "deficits of adaptive functioning", nor did they provide any standards or guidelines by which to assess and measure the existence or severity of a claimant's alleged deficits. *Id*. at *8. We further observed that no Third Circuit case had addressed this issue, and looked to a Social Security regulation for guidance:

In April of 2002, the SSA published a regulation entitled *Technical Revisions to Medical Criteria for Determinations of Disability*, 67 FR 20018 (April 24, 2002). The comments to the regulation explain why the definition of § 12.05 was drafted rather than adopting the definition found in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV), a handbook for mental health professionals, published by the American Psychiatric Association. 67 FR at 20022. The SSA explained that in developing its definition of mental retardation, *i.e.*, "deficits in adaptive functioning," the SSA considered the different definitions of the four major professional organizations in the United States that work with mental retardation, which include both the American Psychiatric Association ("APA"), as well as the American Association on Mental Retardation ("AAMR"). The various definitions from the four organizations all have in common the requirement of "deficits in intellectual functioning," however, the

> organizations differ as to the age of onset and the method of measuring the required deficits in adaptive functioning. The SSA clarified that, although the agency has set the age of onset at twenty-two (22) for the purposes of the Social Security Act, "it does not seek to endorse the methodology of one professional organization over another … [and] allow[s] use of any of the measurement methods recognized and endorsed by [one of] the [four major] professional organizations" that work with mental retardation. *Id*. Thus, in order to properly assess a claimant's alleged mental retardation to determine if deficits in adaptive functioning exist, according to the SSA, an ALJ should consult either the APA's *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV), the standard set forth by the AAMR, or the criteria of the other major mental health organizations.

*Logan*, 2008 WL at *8 (footnotes omitted).[7]

We also looked to, *inter alia*, the Tenth Circuit's decision in *Barnes v. Barnhart*, 116 Fed. Appx. 934 (10th Cir. 2004), in which the court found that the ALJ failed to properly assess the claimant's adaptive functioning abilities when the ALJ relied on the claimant's daily activities, social skills and educational history in concluding that she failed to show deficits in adaptive behavior sufficient to meet the capsule definition. *Logan*, 2008 WL at *9. We observed that the *Barnes* court ultimately remanded the case to the ALJ with instructions to comply with the SSA's directive by identifying and applying one of the four standards of measurement used by professional organizations, rather than "improvising his own definition"

---

[7] Our decision referred to an earlier version of the DSM when citing to the standard for measuring deficits in adaptive functioning. The most recent text revision in effect at the time of the ALJ's decision in this case did not change this standard. Deficits in adaptive functioning requires "significant limitations in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 41 (4th ed. Text Revision 2000). The AAMR (now the American Association on Intellectual and Developmental Disabilities), provides the following standard: significant limitations in intellectual functioning and adaptive behavior as expressed in conceptual (*i.e.*, receptive and expressive language, reading and writing, money concepts, and self-direction); social (*i.e.*, interpersonal, responsibility, self-esteem, gullibility, naivete, follows rules, obeys laws, and avoids victimization); and practical adaptive skills (*i.e.*, personal activities of daily living such as eating, dressing, mobility and toileting; instrumental daily activities of daily living such as preparing meals, taking medication, using the telephone, managing money, using transportation, and doing housekeeping activities; maintaining a safe environment, and occupational skills). *Logan*, 2008 WL 4279820 at *8 n.4 (citing *Manual of Diagnosis and Professional Practice in Mental Retardation* (American Association on Mental Retardation, 1993)).

for "deficits in adaptive functioning." *Id*. at *9 (quoting *Barnes*, 116 Fed. Appx. at 942).[8] Accordingly, we concluded:

> It is not clear from the ALJ's opinion which organizational measure (if any) the ALJ used to assess whether Plaintiff had "deficits in adaptive functioning." Although the ALJ did note that Plaintiff's academic skills did not seem to indicate "deficits in adaptive functioning," the ALJ's opinion did not address Plaintiff's skills in the area of communication, self-direction, work, leisure, health, and safety or in the areas of conceptual, social, and practical skills, or any of the other criteria which are included in the standards of the AAMR or APA. Thus, the ALJ's assessment of Plaintiff's "deficits in adaptive functioning" does not seem to comply with the court's directive in *Barnes v. Barnhart* or the SSA's ruling set forth in *Technical Revisions to Medical Criteria for Determinations of Disability*, 67 FR 20018 (April 24, 2002). …

*Logan*, 2008 WL 4279820 at *10.

While we ultimately concluded in *Logan* that a remand was unnecessary due to the claimant's inability to meet the third criteria of listing 12.05, in this case we find a remand is warranted. The ALJ here found insufficient evidence to establish that Plaintiff had deficits in adaptive functioning based on his findings that she: (1) left school because she was pregnant, and not because she was unable to complete her coursework; (2) worked only one job that ended because the restaurant closed; (3) was capable of "managing the benefits paid to her son;" (4) was capable of reading the warning label on one of her prescriptions; and (5) did not seek assistance through the Office of Vocational Rehabilitation or any other program for help with her learning disabilities. (R. at 17). Absent from the ALJ's discussion, however, is any explanation of the standard utilized by him for making these ultimate findings, as required by the SSA's directive. *See Lansdowne v. Astrue*, 2012 WL 4069363 at *5 (W.D.Pa. 2012) (finding remand appropriate where it was not clear from the ALJ's decision which organization's standard for measuring deficits in adaptive functioning, if any, was consulted); *Grunden v. Astrue*, 2011 WL

---

[8] In *Barnes*, the ALJ cited to the following evidence in support of his conclusion that the claimant did not meet the capsule definition: "The claimant maintains neatness and grooming, cares for her children. She went to school to the 10th grade and left to be married, nor for educational reasons. The dissolution of her marriage was due to her husband's violation of his vows, and was not due to her own deficits." *Barnes*, 116 Fed. Appx. at 939.

15

4565502 at *5 (W.D.Pa. 2011) (holding remand required where ALJ failed to comply with SSA's directive in *Technical Revisions to Medical Criteria for Determinations of Disability*).

Although the Commissioner does not point to any particular standard utilized by the ALJ in this case, she points to other evidence in the record which, in her view, supports the ALJ's determination in this regard, such as Dr. Hillin's consultative examination findings, and Dr. Link's opinion that Plaintiff's mental retardation did not meet listing 12.05C. However, while the ALJ discussed this evidence in connection with assessing the Plaintiff's RFC, it was not utilized by the ALJ in assessing Plaintiff's deficits in adaptive functioning, or linked in any way to his discussion relative to the listing. We conduct our review on the basis of the reasons articulated by the ALJ and decline to supply reasons or conclusions not articulated by the ALJ. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87-88, 63 S.Ct. 454, 87 L.Ed. 626 (1943) ("it is a fundamental rule of administrative law that a reviewing court … must judge the propriety of the action solely on the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."); *Fargnoli v. Massanari*, 247 F.3d 34, 44 n.7 (3d Cir. 2001) (holding that the district court's decision was contrary to the holding in *Chenery* when it recognized that relevant evidence was not considered by the ALJ and attempted to justify the ALJ's decision by substituting evidence not mentioned by the ALJ, but found in the court's own independent analysis); *Cefalu v. Barnhart*, 387 F. Supp. 2d 486 (W.D.Pa. 2005) ("the district court considers and reviews only those findings upon which the ALJ based the decision, and cannot rectify errors, omissions or gaps therein by supplying additional findings from its own independent analysis of portions of the record which were not mentioned or discussed by the ALJ").

Finally, we reject the Commissioner's argument that the SSA regulation does not require the ALJ to articulate which standard or guideline he or she utilizes from one of the four major professional organizations in determining whether a claimant has deficits in adaptive functioning. Courts should not be required to guess what standard an ALJ has chosen to apply when conducting its substantial evidence review of the ALJ's decision. *Lansdowne*, 2012 WL

4069363 at *5 (noting that the court was "left to guess as to which standard the ALJ employed in his analysis"); *Grunden*, 2011 WL 4565502 at *5 (same).

In sum, this matter will be remanded, and "the ALJ shall fully develop the record and explain [his or her] findings … to ensure that the parties have an opportunity to be heard on the remanded issues and prevent *post hoc* rationalization" by the ALJ. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798, 800 (3d Cir. 2010). The ALJ shall identify which standard he is relying upon to conduct his evaluation, and then apply this standard to all the relevant evidence in determining whether Plaintiff has deficits in adaptive functioning. Testimony need not be taken, but the parties should be permitted input via submissions to the ALJ. *Id*. at 801 n.2.

## VI. CONCLUSION

For the reasons discussed above, Plaintiff's Motion for Summary Judgment (ECF No. 9) is GRANTED in part and DENIED in part; Defendant's Motion for Summary Judgment (ECF No. 11) is DENIED; and this matter is REMANDED for further consideration, consistent with this Memorandum Opinion.

An appropriate Order follows.

*s/ Nora Barry Fischer*
United States District Judge

February 14, 2014

cc/ecf: All parties of record.